UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| PAUL ERSTAD,<br><br>      Plaintiff,<br><br>vs.<br><br>CAROLYN W. COLVIN, Acting Commissioner, Social Security Administration,<br><br>      Defendant. | CIV. 14-5052-JLV<br><br>ORDER REVERSING DECISION OF THE COMMISSIONER AND REMANDING FOR CALCULATION AND AWARD OF BENEFITS |

**INTRODUCTION**

Plaintiff Paul Erstad filed a complaint appealing from an administrative law judge's ("ALJ") decision denying disability insurance benefits. (Docket 1). Defendant denies plaintiff is entitled to benefits. (Docket 6). The court issued a briefing schedule requiring the parties to file a joint statement of material facts ("JSMF"). (Docket 8). The parties filed their JSMF. (Docket 14). For the reasons stated below, plaintiff's motion to reverse the decision of the Commissioner (Docket 17) is granted.

**FACTUAL AND PROCEDURAL HISTORY**

The parties' JSMF (Docket 14) is incorporated by reference. Further recitation of salient facts is incorporated in the discussion section of this order.

On April 10, 2013, Mr. Erstad filed applications for disability insurance benefits alleging an onset of disability date of November 14, 2012. Id. ¶ I(1). On June 2, 2014, the ALJ issued a decision finding Mr. Erstad was not disabled.

Id.; see also Administrative Record at pp. 11-23 (hereinafter "AR at p. ___"). The Appeals Council denied Mr. Erstad's request for review. (Docket 14 ¶ I(1)). The ALJ's decision constitutes the final decision of the Commissioner of the Social Security Administration. Id. It is from this decision which Mr. Erstad timely appeals.

The issue before the court is whether the ALJ's decision of June 2, 2014, that Mr. Erstad was not "under a disability, as defined in the Social Security Act, from November 14, 2012 through [June 2, 2014]" is supported by substantial evidence in the record as a whole. (AR at p. 23); see also Howard v. Massanari, 255 F.3d 577, 580 (8th Cir. 2001) ("By statute, the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive.") (internal quotation marks and brackets omitted) (citing 42 U.S.C. § 405(g).

## STANDARD OF REVIEW

The Commissioner's findings must be upheld if they are supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); Choate v. Barnhart, 457 F.3d 865, 869 (8th Cir. 2006); Howard, 255 F.3d at 580. The court reviews the Commissioner's decision to determine if an error of law was committed. Smith v. Sullivan, 982 F.2d 308, 311 (8th Cir. 1992). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Cox v.

Barnhart, 471 F.3d 902, 906 (8th Cir. 2006) (internal citation and quotation marks omitted).

The review of a decision to deny benefits is "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision . . . [the court must also] take into account whatever in the record fairly detracts from that decision."  Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (quoting Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001)).

It is not the role of the court to re-weigh the evidence and, even if this court would decide the case differently, it cannot reverse the Commissioner's decision if that decision is supported by good reason and is based on substantial evidence.  Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005).  A reviewing court may not reverse the Commissioner's decision " 'merely because substantial evidence would have supported an opposite decision.' "  Reed, 399 F.3d at 920 (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995)).  Issues of law are reviewed *de novo* with deference given to the Commissioner's construction of the Social Security Act.  See Smith, 982 F.2d at 311.

The Social Security Administration established a five-step sequential evaluation process for determining whether an individual is disabled. 20 CFR § 404.1520(a)(4).  If the ALJ determines a claimant is not disabled at any step of the process, the evaluation does not proceed to the next step as the claimant is not disabled.  Id.  The five-step sequential evaluation process is:

> whether the claimant is presently engaged in a "substantial gainful activity"; (2) whether the claimant has a severe impairment—one that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education, and work experience); (4) whether the claimant has the residual functional capacity to perform . . . past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove there are other jobs in the national economy the claimant can perform.

Baker v. Apfel, 159 F.3d 1140, 1143-44 (8th Cir. 1998). The ALJ applied the five-step sequential evaluation required by the Social Security Administration regulations. (AR at pp. 11-13).

### STEP ONE

At step one, the ALJ determined Mr. Erstad had not been engaged in substantial gainful activity since November 14, 2012. Id. at p. 13.

### STEP TWO

"At the second step, [the agency] consider[s] the medical severity of your impairment(s)." 20 CFR § 404.1520(a)(4)(ii). "It is the claimant's burden to establish that his impairment or combination of impairments are severe." Kirby v. Astrue, 500 F.3d 705, 707 (8th Cir. 2007). A severe impairment is defined as one which significantly limits a physical or mental ability to do basic work activities. 20 CFR § 1521. An impairment is not severe, however, if it "amounts to only a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." Kirby, 500 F.3d at 707. "If the impairment would have no more than a minimal effect on

4

the claimant's ability to work, then it does not satisfy the requirement of step two." Id. (citation omitted). Additionally, the impairment must have lasted at least twelve months or be expected to result in death. See 20 CFR § 404.1509.

The ALJ found Mr. Erstad suffered from the following severe impairments: "cervicalgia [neck pain] and degenerative disc disease of the cervical spine with status post 2003 cervical fusion of the C3 through C6 vertebrae and 2013 discectomy and decompression at the C6-C7 level . . . ." (AR at p. 13). Mr. Erstad agrees with this finding. (Docket 17).

### STEP THREE

At step three, the ALJ determines whether claimant's impairment or combination of impairments meets or medically equals the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 ("Appendix 1"). 20 CFR §§ 404.1520(d), 404.1525, and 404.1526. If a claimant's impairment or combination of impairments meets or medically equals the criteria for one of the impairments listed and meets the duration requirement of 20 CFR § 404.1509, the claimant is considered disabled. A claimant has the burden of proving an impairment or combination of impairments meet or equals a listing within Appendix 1. Johnson v. Barnhart, 390 F.3d 1067, 1070 (8th Cir. 2004).

At step three, the ALJ found Mr. Erstad "did have severe symptoms, including spinal cord or nerve root compression between November 14, 2012 and September 4, 2013. However, the evidence shows that the claimant responded well to treatment and that his most severe impairments subsided by September 4, 2013. Since the claimant's most severe impairments did not last a

continuous 12 months, the undersigned finds that he did not satisfy the requirements for Listing 1.04A."   (AR at p. 16).

Mr. Erstad challenges this finding.   (Docket 17 at pp. 2-10).   He asserts the ALJ erred because the "treatment notes show[] that he met the requirements of Listing 1.04A from November 14, 2012, through the date of hearing."   Id. at p. 4.   Mr. Erstad argues the functional capacities evaluation relied upon by the ALJ addresses factors different from those "used to determine whether a claimant meets Listing 1.04A."   Id. at p. 8.   He claims "[a] functional capacities evaluation is a test performed by a physical therapist which is designed to give safe work limitations so that claimants can attempt to return back to work[,] [whereas] . . . [the] full physical examination[s] . . . done by Dr. Lawlor, Dr. Vonderau, Christopher Schlegel, and Dr. Watt[]" address the criteria required to satisfy Listing 1.04A.   Id. at pp. 8-9.

The ALJ's reference is to a physical work performance evaluation.   "On September 4, 2013, [Mr. Erstad] underwent a Physical Work Performance Evaluation (FCE)[1]. . . ."   (AR at p. 19).   "The evaluation included 36 tasks that were divided into seven sections.   The sections evaluated were dynamic strength, position tolerance, mobility, fine motor skills, balance, coordination, and endurance.   After the FCE was complete, the evaluating source indicated that the claimant was 'capable of sustaining the SEDENTARY level of work for an 8-hour day.'   The report also included additional limitations that are consistent with the above residual functional capacity."   Id. (referencing AR at p. 620)

---

[1]The ALJ references this evaluation as a functional capacity evaluation. (AR at p. 19).

(capitalization in original). The ALJ then referenced a follow-up examination. "[O]n October 9, 2013, [Mr. Erstad's] treating source, Tim J. Watt, MD, found that the claimant had reached maximum medical improvement . . . . Moreover, he found that the claimant had permanent restrictions that were consistent with those found in the September 4, 2013 FCE." Id. (referencing AR at pp. 629-32).

Based on the ALJ's evaluation of this evidence, he concluded Mr. Erstad did not qualify under Listing 1.04A because the severe symptoms of his impairments did not continue for at least twelve months. (AR at p. 16). To determine whether the ALJ erred factually or as a matter of law, it is necessary to examine the pertinent provisions of the Appendix 1 in detail.

Relevant to Mr. Erstad's claim, Listing 1.04 focuses on "[d]isorders of the spine (e.g., herniated nucleus pulposus,[2] spinal arachnoiditis,[3] spinal

---

[2] "Herniated nucleus pulposus is a disorder frequently associated with the impingement of a nerve root. Nerve root compression results in a specific neuro-anatomic distribution of symptoms and signs depending upon the nerve root(s) compromised." Appendix 1 at 1.00(K)(1). "Herniated nucleus pulposus is more commonly known as a herniated disc. A herniated (slipped) disk occurs when all or part of a disk in the spine is forced through a weakened part of the disk." Cumella v. Colvin, 936 F. Supp. 2d 1120, 1135 n.44 (D.S.D. 2013) (citing http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001478) (internal quotation marks omitted).

[3] "Spinal arachnoiditis is a condition characterized by adhesive thickening of the arachnoid which may cause intermittent ill-defined burning pain and sensory dysesthesia, and may cause neurogenic bladder or bowel incontinence when the cauda equina is involved." Appendix 1 at 1.00(K)(2)(a). "Spinal arachnoiditis is a chronic pain disorder caused by the inflammation of the arachnoid membrane and subarachnoid space that surround the nerves of the spinal cord." Cumella, 936 F. Supp. 2d at 1135 n.45 (D.S.D. 2013) (citing http://www.spine-health. com/glossary/a/arachnoiditis) (internal quotation marks omitted).

stenosis,[4] osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture)[.]" Cumella, 936 F. Supp. 2d at 1135 (citing Appendix 1 at Listing 1.04). "These spinal disorders must 'result [ ] in compromise of a nerve root . . . or the spinal cord. With . . . [e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss. . . .'" Id. (citing Appendix 1 at Listing 1.04A). "Disorders of the spine, listed in 1.04, result in limitations because of distortion of the bony and ligamentous architecture of the spine and associated impingement on nerve roots . . . or spinal cord. Such impingement on nerve tissue may result from a herniated nucleus pulposus, spinal stenosis, arachnoiditis, or other miscellaneous conditions. Neurological abnormalities resulting from these disorders are to be evaluated by referral to the neurological listings in 11.00ff,[5] as appropriate. (See also 1.00B and E.)" (Appendix 1 at Listing 1.00K).

---

[4]"Spinal stenosis is narrowing of the spinal column that causes pressure on the spinal cord, or narrowing of the openings . . . where spinal nerves leave the spinal column." Cumella, 936 F. Supp. 2d at 1135 n.46 (citing http://www.ncbi.nlm.nih. gov/pubmedhealth/PMH0001477).

[5]Through informal inquiries of the Disability Insurance Office of the Social Security Administration apparently "ff" does not refer to a section, but rather is a Latin abbreviation for "foliis," meaning "on the following pages." According to the court's source "foliis" means "leaf." http://www.archives.nd.edu/cgi-bin/wordz.pl?keyword=foliis, last visited September 25, 2015. Regardless, the court will accept that the regulation is inviting the evaluator to consider neurological impairments under Listing 11.00.

Listing 1.00B addresses loss of function to the musculoskeletal system. "Under this section, loss of function may be due to bone or joint deformity or destruction from any cause; miscellaneous disorders of the spine with or without radiculopathy or other neurological deficits; . . . or fractures or soft tissue injuries . . . requiring prolonged periods of immobility or convalescence. . . . Impairments with neurological causes are to be evaluated under 11.00ff." (Appendix 1 at Listing 1.00B(1)).

> The regulation defines the loss of function for purposes of the listing:
>
> Regardless of the cause(s) of a musculoskeletal impairment, functional loss for purposes of these listings is defined as the inability to ambulate effectively on a sustained basis for any reason, including pain associated with the underlying musculoskeletal impairment, or the inability to perform fine and gross movements effectively on a sustained basis for any reason, including pain associated with the underlying musculoskeletal impairment. The inability to ambulate effectively or the inability to perform fine and gross movements effectively must have lasted, or be expected to last, for at least 12 months. For the purposes of these criteria, consideration of the ability to perform these activities must be from a physical standpoint alone. . . .

(Appendix 1 at Listing 1.00B(2)(a)).

The critical element for the evaluation of loss of function in Listing 1.00B is pain.

> Pain or other symptoms may be an important factor contributing to functional loss. In order for pain or other symptoms to be found to affect an individual's ability to perform basic work activities, medical signs or laboratory findings must show the existence of a medically determinable impairment(s) that could reasonably be expected to produce the pain or other symptoms. The musculoskeletal listings that include pain or other symptoms among their criteria also

9

> include criteria for limitations in functioning as a result of the listed impairment, including limitations caused by pain. It is, therefore, important to evaluate the intensity and persistence of such pain or other symptoms carefully in order to determine their impact on the individual's functioning under these listings. See also §§ 404.1525(f) and 404.1529 of this part . . . .

Id. at Listing 1.00B(2)(d).

As indicated by Listing 1.00K an examination of the spine under Listing 1.00E is important.

> Examination of the spine should include a detailed description of gait, range of motion of the spine given quantitatively in degrees from the vertical position (zero degrees) . . . any other appropriate tension signs, motor and sensory abnormalities, muscle spasm, when present, and deep tendon reflexes. . . .

Id. at Listing 1.00E(1). The regulations acknowledge some "[n]eurological abnormalities may not completely subside after treatment or with the passage of time." Id. at Listing 1.00E(2). Some of these neurological abnormalities do not qualify under Listing 1.04. "[R]esidual neurological abnormalities that persist after it has been determined clinically or by direct surgical or other observation that the ongoing or progressive condition is no longer present will not satisfy the required findings in 1.04." Id.

There is no question the physical impairments considered under Listing 1.04 must be in existence for a continuous period of at least twelve months. 20 CFR § 404.1509 ("Unless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least

10

12 months. We call this the duration requirement."). The question is: How is the duration requirement determined?

The Commissioner argues the court must accept the ALJ's conclusion derived from the September 9, 2013, FCE that Mr. Erstad's conditions did not meet "all of listing 1.04A's requirements for a continuous period of at least 12 months." (Docket 18 at p. 9) (referencing Barnhart v. Walton, 535 U.S. 212, 217-18 (2002), Sullivan v. Zebley, 493 U.S. 521, 530 (1990), Carlson v. Astrue, 604 F.3d 589 (8th Cir. 2010) and Johnson v. Barnhart, 390 F.3d 1067, 1070 (8th Cir. 2004)). The court will examine each of these references.

"[A] claimant is not disabled 'regardless of [his] medical condition,' if he is doing 'substantial gainful activity.' " Barnhart, 535 U.S. at 217 (citing 20 CFR § 404.1520(b)). "[T]he Agency has interpreted this regulation to mean that the claimant is not disabled if 'within 12 months after the onset of an impairment . . . the impairment no longer prevents substantial gainful activity.' " Id. (citing 65 Fed. Reg. 42774 (2000). Barnhart does not make reference to Appendix 1 nor does it explain the determination that a Listing within Appendix 1 qualifies for automatic disability status.

Zebley does specifically discuss the Listings of Appendix 1. "For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." Zebley, 493 U.S. at 530 (italics in original, other emphasis added) (referencing Social Security Ruling

11

(SSR) 83–19 at p. 9) ("An impairment 'meets' a listed condition . . . only when it manifests the specific findings described in the set of <u>medical criteria</u> for that listed impairment.") (emphasis added).   "For a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments, is 'equivalent' to a listed impairment, he must present <u>medical findings</u> equal in severity to *all* the criteria for the one most similar listed impairment."   <u>Id.</u> at 531 (italics in original, emphasis added) (referencing 20 CFR § 416.926(a) ("a claimant's impairment is 'equivalent' to a listed impairment 'if the <u>medical findings</u> are at least equal in severity' to the <u>medical criteria</u> for 'the listed impairment most like [the claimant's] impairment') (emphasis added); SSR 83–19, at 91 (a claimant's impairment is 'equivalent' to a listing only if his symptoms, signs, and laboratory findings are 'at least equivalent in severity to' the criteria for 'the listed impairment most like the individual's impairments(s); when a person has a combination of impairments, the <u>medical findings</u> of the combined impairments will be compared to the findings of the listed impairment most similar to the individual's most severe impairment' ") (emphasis added).

"A claimant cannot qualify for benefits under the 'equivalence' step by showing that the overall <u>functional impact</u> of his unlisted impairment or combination of impairments is as severe as that of a listed impairment."   <u>Id.</u> at 531-32 (emphasis added) (referencing SSR 83–19, at 91–92 ("[I]t is incorrect to consider whether the listing is equaled on the basis of an assessment of *overall* <u>functional impairment</u>. . . . The <u>functional consequences</u> of the impairments . . .

12

irrespective of their nature or extent, *cannot* justify a determination of equivalence") (italics in original, other emphasis added).

The reasons for the distinctions between medical consequences and functional consequences are clear:

> [The Commissioner] explicitly has set the medical criteria defining the listed impairments at a higher level of severity than the statutory standard.  The listings define impairments that would prevent an adult, regardless of his age, education, or work experience, from performing any gainful activity, not just substantial gainful activity. . . . The reason for this difference between the listings' level of severity and the statutory standard is that, for adults, the listings were designed to operate as a presumption of disability that makes further inquiry unnecessary.  That is, if an adult is not actually working and his impairment matches or is equivalent to a listed impairment, he is presumed unable to work and is awarded benefits without a determination whether he actually can perform his own prior work or other work.

Id. at 532.  The Zebley Court makes clear the determination under the listings must be done based on medical evidence and "without a determination whether he actually can perform his own prior work or other work."  Id. (emphasis added).

The Commissioner urges the court to consider Carlson, 604 F.3d 589. (Docket 18 at p. 11).   In Carlson, the question was whether an ALJ was required "to receive expert evidence on the issue of equivalence."   Id. at 592.   The United States Court of Appeals for the Eighth Circuit concluded "when an ALJ determines that equivalency is not established, the requirement to receive expert opinion evidence into the record may be satisfied by a Disability Determination and Transmittal form or other document that reflects the findings of the

13

consultant and is signed by the consultant." Id. at 593 (referencing SSR 96–6p, 61 Fed. Reg. 34,466, 1996 WL 374180) ("longstanding policy requires that the judgment of a physician . . . designated by the Commissioner on the issue of equivalence on the evidence before the administrative law judge . . . must be received into the record as expert opinion evidence and given appropriate weight."). In Carlson, a "state medical consultant" determined "an RFC[6] assessment was necessary . . . and thus implied that Carlson did not equal Listing 5.08." Id. Because no physical exam provided evidence that the claimant met or equaled a listing, the court concluded the ALJ's decision was "supported by substantial evidence." Id. Carlson dealt with the absence of an impairment qualifying under the listing and not with the longevity requirement under Appendix 1.

Johnson also speaks to the qualification for inclusion in an Appendix 1 listing. "To meet a listing, an impairment must meet all of the listing's specified criteria. . . . Medical equivalence must be based on medical findings." Johnson, 390 F.3d at 1070 (emphasis added) (referencing Zebley, 493 U.S. at 530–31, and 20 CFR § 416.926(b)) (internal quotation marks omitted). "A claimant . . . must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment." Zebley, 493 U.S. at 531 (italics in original; emphasis added).

---

[6]Before considering step four of the evaluation process, the ALJ is required to determine a claimant's residual functional capacity. 20 CFR § 404.1520(e).

The Commissioner argues that upon a "similar citation of evidence" the Eighth Circuit rejected a comparable claim.  (Docket 18 at p. 11) (referencing Vossen v. Astrue, 612 F.3d 1011, 1015 (8th Cir. 2010)).  In Vossen, the court observed the ALJ concluded the "medical records did not show the documented neurological loss required by the listing. . . . [A]n MRI . . . showed no superimposed disc herniation, central or lateral canal stenosis, or cord or nerve root impingement . . . . [a] neurological examination described Vossen as 'normal. . . . [and a] straight-leg test . . . was negative."  Vossen, 612 F.3d at 1015.  The court finds the Commissioner's argument disingenuous.  There is no question that Mr. Erstad's medical condition was not normal, as he suffered a nerve root impingement, disc herniation, and severe degenerative disc disease of the cervical spine.

It is clear by the directives of Zebley, supra, and Johnson, supra, that an ALJ must consider only medical evidence to evaluate whether an impairment qualifies within a listing of Appendix 1.  It is the medical status of the impairment, and not the functional consequences which an impairment may impose or not impose, which drives whether the impairment qualifies under Appendix 1.

The ALJ erred as a matter of law by concluding that the FCE of September 2013 was appropriate evidence to conclude Mr. Erstad's impairments "subsided," thus ending the duration requirement for Listing 1.04A of Appendix 1.  (AR at p. 16).  The FCE was a functional evaluation and not a medical

15

evaluation of Mr. Erstad's impairments. Because Mr. Erstad was "not actually working and his impairment matches or is equivalent to a listed impairment, he is presumed unable to work . . . without a determination whether he actually can perform . . . other work." Zebley, 493 U.S. at 532.

For medical evidence, the ALJ was required to look further in the timeline of the record to determine if the duration requirement for Listing 1.04A was satisfied. That next piece of medical evidence in the record is the examination of October 9, 2013. (AR at pp. 629-31). The physician who examined Mr. Erstad on that date was not Dr. Watt, but Dr. Peter Vonderau of The Rehab Doctors. Id. Dr. Vonderau's examination noted the following:

PHYSICAL EXAMINATION:

MOTOR: He has give-way weakness diffusely throughout the left upper extremity secondary to pain. He has full strength throughout the right upper extremity.

SENSATION: He endorses decreased pinprick sensation diffusely throughout the left upper extremity. He has full sensation throughout the right upper extremity.

REFLEXES: Bilateral upper extremity muscle stretch reflexes are physiologic and symmetric with the exception of the left triceps reflex, which is absent.

SPINE ROM: Cervical spine range of motion is 10% in rotation to the right and 15% to the left. Extension is 5%.[7]

---

[7]These findings are more debilitating than Dr. Vonderau's findings of June 14, 2013. (AR at p. 452). On that date, Mr. Erstad's "[c]ervical spine range of motion [was] 25% in flexion and 10% in extension and rotation to each side." Id.

16

> PROVOCATIVE MANEUVERS:
>
> > NECK: Spurling's test[8] could not be assessed due to his significantly limited cervical spine range of motion.

(AR at p. 629). Dr. Vonderau reported "Mr. Erstad's neck pain and left upper extremity radicular symptoms persist. At this point, he is more than 10 months out from his injury and I consider him to be at <u>maximum medical improvement</u>. Per the *AMA Guides to Evaluation of Permanent Impairment, 4th Edition,* he is best classified under cervical DRE Category III for left C7 radiculopathy. This results in a 15% whole person Impairment Rating." <u>Id.</u> at 630 (emphasis added). By way of physical limitations, Dr. Vonderau "recommend[ed] permanent restrictions per the FCE . . . ." <u>Id.</u>

The ALJ did mention Dr. Watt's examination of Mr. Erstad on March 6, 2014. (AR at p. 20). From Dr. Watt's report, the ALJ noted Mr. Erstad "reported that he was experiencing continued neck pain that caused him to rest frequently . . . ." <u>Id.</u> (referencing AR at p. 683). What the ALJ did not report was the next sentence of the medical record: "He also complains that he is having frequent, virtually daily headaches that are triggered by his muscle spasms." (AR at p. 683). While the ALJ summarized Dr. Watt's physical examination findings, those are best repeated in the same context provided by

---

[8]"Spurling test" is an "evaluation of cervical nerve root impingement in which the patient extends the neck and rotates and laterally bends the head toward the symptomatic side; an axial compression force is then applied by the examiner through the top of the patient's head; the test is considered positive when the maneuver elicits the typical radicular arm pain." *Stedmans Medical Dictionary* (2014) at 908330.

17

the doctor: "No objective deficits in his arms.  His voice is fine.  His wound is well healed.  He has limited range of motion and exhibits a lot of guarding behaviors in any head or neck motion.  He does have tenderness in his paraspinous muscles."  Id.  Dr. Watt's assessment was "[s]tatus post multiple cervical operations with residual neck after workplace injury."  Id.

Had the ALJ properly considered Dr. Vonderau's examination of October 2013, it would have been clear from the medical record that Mr. Erstad's severe impairments were permanent and that no improvement was going to occur in the future.  Mr. Erstad's cervical range of motion was significantly restricted, the Spurling test could not be used because of his "significantly limited cervical spine range of motion," and his left upper arm "radicular symptoms persist[ed]."  (AR at p. 629-30).  Now eleven months post-surgery, Dr. Vonderau concluded to "a reasonable degree of medical probability" that Mr. Erstad had achieved "maximum medical improvement."  Id.  Maximum medical improvement means Mr. Erstad would get no better, his condition will not improve.  Thirty days further down the road would not change Mr. Erstad's diagnosis or prognosis.  This medical record satisfies the duration requirement of an impairment lasting at least twelve continuous months for inclusion in Listing 1.04A.

The ALJ erred in fact and as a matter of law.  Smith, 982 F.2d at 311; Zebley, 493 U.S. at 532; and Johnson, 390 F.3d at 1070.  The court finds Mr. Erstad qualified at step three because his impairments, spinal cord and nerve

compression, and degenerative disc disease of the cervical spine, met or medically equaled the criteria of Listing 1.04A of Appendix 1.

"The reason for [the] difference between the listings' level of severity and the statutory standard is that . . . the listings were designed to operate as a presumption of disability that makes further inquiry unnecessary." Zebley, 493 U.S. at 532. "If the claimant has an impairment that meets the medical criteria of a listed impairment, the claimant is presumptively disabled, and no further inquiry is necessary." Shontos v. Barnhart, 328 F.3d 418, 424 (8th Cir. 2003). See also Myers v. Colvin, 721 F.3d 521, 525 (8th Cir. 2013) ("If medical equivalence [of a listed impairment] is established, the claimant will be found disabled."). Mr. Erstad is disabled and entitled to benefits. 20 CFR §§ 404.1520(a)(4)(iii) and 404.1520(d).

The court may affirm, modify, or reverse the Commissioner's decision, with or without remand to the Commissioner for a rehearing. 42 U.S.C. § 409(g). If the court determines that the "record overwhelmingly supports a disability finding and remand would merely delay the receipt of benefits to which the plaintiff is entitled, reversal is appropriate." Thompson v. Sullivan, 957 F.2d 611, 614 (8th Cir. 1992). Remand to the Commissioner is neither necessary nor appropriate in this case. Mr. Erstad is disabled and entitled to benefits. Reversal is the appropriate remedy at this juncture. Thompson, supra.

## ORDER

In accord with the above decision, it is

ORDERED that plaintiff's motion (Docket 17) is granted and the decision of the Commissioner of June 2, 2014, is reversed and the case is remanded to the Commissioner for the purpose of calculating and awarding benefits to the plaintiff Paul Erstad.

Dated September 28, 2015.

BY THE COURT:

/s/ *Jeffrey L. Viken*
JEFFREY L. VIKEN
CHIEF JUDGE